We'll call the first case. We have two cases to be argued this afternoon. First case we'll call is Aaron v. China National. Excuse me. Good afternoon, your honors. May it please the court, I'm Eric Shumsky and I represent the appellants. Your honors, I want to start by being clear about what is and what isn't at stake in this appeal. What is not at stake is whether the plaintiffs can recover. Plaintiffs established personal jurisdiction over Taishan, the defendant responsible for more than 97 percent of the dry wallet issue here, and most plaintiffs have actually settled and released their claims and are being paid. What is at stake here are important legal questions about choice of law and corporate law that have application far beyond this case, and I'd like to highlight two of them. First, the district court legally erred by not applying Chinese corporate law, and that error resolves this entire appeal. It is quite clear that Florida, Virginia, and Louisiana all resolve corporate law questions under the law of the place of incorporation, and it is undisputed that each defendant is incorporated in China. So for plaintiffs to impute corporate contacts under Chinese law, they bear a particularly heavy burden. They have to show abuse of the corporate form to evade debts, but plaintiffs themselves said that they didn't meet this standard, and they didn't have to. This is at ROA 60331. They said that below, and the district court specifically found that there was no fraud when it rejected alter ego under both Florida and Virginia law. That's in the Plaintiffs' argument instead was that Chinese law is the same as every single one of the forum laws, but that's just logically impossible. Look at the chart on page 18 of the blue brief. These laws can't all be the same as Chinese law. They led to different outcomes from one another. Didn't you urge that to the court? Not at all, Your Honor, and I want to be absolutely clear about this. We made an argument in the alternative. We said this is what the law is, and we went under that, but if it's something different, we went under that too. We didn't say the laws were the same. Think about it in terms of a constitutional challenge. A litigant can say the relevant standard is strict scrutiny, but even if you think it's intermediate scrutiny, we win, and no one would think that litigant is saying that strict scrutiny and intermediate scrutiny are the same. You argued that the result would be the same. Well, that's right. We argued that we would win under any articulation of the standard, and the district court disagreed with that. What the district court ended up doing was reaching different results under the different laws, and under those circumstances, there certainly isn't a false conflict, and if you look at Chinese law again, plaintiffs never even argued that they could meet the heavy burden of abuse of the corporate form to evade debts. The second major point I wanted to make, and this relates to the second category of legal error, relates to corporate law. Even if the different forum laws applied, the district court's own findings, two of them in particular, make clear that none of the forum laws are satisfied. First, the court specifically found that Taishan serves no improper purpose. Again, that's in the record at 58421 and 58431, and that resolves the Louisiana law argument. Louisiana alter ego law requires fraud or deceit. Now, remember that plaintiffs didn't actually even argue Louisiana alter ego law here. The district court found that on its own, but its own finding disproves that it's satisfied here. The second critical finding is at pages 58392 and 58393 of the record, and there the district court finds that Taishan is, and this is a direct quote, successful and autonomous, but that wasn't just a passing remark. The district court went on to elaborate numerous ways in which this is true. It pointed out that Taishan is highly profitable, that it isn't undercapitalized, that it complies with Chinese corporate requirements, that it's responsible for its own debts and liabilities, and on and on and on. And that conclusively resolves Florida law, where the standard is that the parent has to control the subsidiary, has no independent interests. Clearly a successful and autonomous company has independent interests. Now, in addition to those two critical findings, there's a missing finding too. Florida and Virginia agency law both require mutual assent that the agent will act on entirely. There was literally no argument by the plaintiffs that Taishan was acting on behalf of BNBM when it was taking the actions that are at issue in this litigation. And so with that, that's an independent basis on which both Florida and Virginia agency law cannot be satisfied here and were not satisfied. I'd like to circle back around to the Chinese law question because for the reasons I indicated at the outset, we really do think that's where this appeal starts and ends. Plaintiffs have never articulated, at least not in their briefing here, what they think the Chinese law standard is. They've also never actually argued that they prevail under any vague assertion that Chinese law looks to control and that that's enough. But if you look at the sources that were at issue in the record here, it's quite clear what Chinese law requires. Intentional abuse of the corporate form to evade debts. That's clear from the text of Article 20 of the company law. We also have the legislative history from the Legislative Affairs Committee of the Chinese Congress. That's at 30371. And indeed, there were experts on both sides that verified that that's true. There's the declaration by Yan, the declaration by Clark, and the declaration by Liu that plaintiffs submitted. Each of those experts confirmed that the standard relates to intentional abuse of the corporate form. Or as Yan put it, and this is a quote at 30319, that the corporate form has been intentionally and maliciously abused by a shareholder in order to evade company debts. We have precedent from 2014, Chinese drywall precedent, that applied Florida law and Louisiana law on the assumption that they're no different than Chinese law when it comes to the imputation of contacts. And what are we to do with that precedent in this case? Well, I think that the way Your Honor put it is exactly right. It was an assumption. And it was an assumption because there was an admission by a litigant, not us, not by my clients, by Taishan, that Florida and Chinese law are the same. And they're wrong about that. The standards are quite different. So there's not precedent that binds this court. It was a party admission. And if you look at it independently, you'll see that the standards indeed are quite different. The Chinese law standard is what I was just articulating. The Florida standard approaches things, the Florida agency law standard, that is, approaches things quite differently. It's that the parent must control the subsidiary's day-to-day operations so tightly that the subsidiary has no separate interests. They're quite different approaches to looking at this question. So when you're looking at agency law as the basis for imputing contacts for purposes of personal jurisdiction, do you look at the place of incorporations agency law or the forum state's agency law? You look at the forum state's choice of law rules. And here, each of the forum states looks to the place of incorporation to assess what Florida, for instance, refers to as the internal affairs of a corporation, whether you impute contacts. And there's the Chatlos case in Florida that we've pointed the court to. And here, at least in the district court, there wasn't even any dispute about the fact that each of the forum jurisdictions applies the law of the place of incorporation. And so here, we have Chinese law, and we have all of these sources that look for fraud or abuse, again, intentional abuse of the corporate forum. I want to hasten to note, I think this is an important point, that that's not a particularly exotic standard. Remember, again, that the district court specifically concluded that there was no alter ego under both Florida law and under Virginia law. And it found that because it concluded that Taishan doesn't serve an improper purpose. The alter ego laws in those states use an analysis that's somewhat similar to the Chinese law standard here. And again, the district court itself concluded that that standard couldn't be met. If the court does go on, contrary to what I've just been arguing, and look at the forum laws, we think that even so, none of them is satisfied. And it's important to be very clear about what the tests are in the forums. There's a looseness to the way some of this has been discussed, and I alluded to this earlier, sort of generalized talk about control. And that's not what Louisiana alter ego law or Florida agency law looks at. The test in Louisiana law is essentially fraud or deceit. And there is a long and robust history of this, starting in the Louisiana Supreme Court with cases like Riggins and Bujold and Glaser. And these courts are very clear that Louisiana strongly favors doctrines of corporate separateness. And when, as the district court specifically found here, parties observe corporate formalities, as this court put it in Administrators of Tulane, a party has a, quote, unquote, heavy burden to get past that. Or as this court put it in Heward, that veil piercing is a drastic remedy. And again, there is no showing here of fraud or deceit. On the contrary, the district court specifically concluded that there had not been fraud. Instead, the plaintiff's principle move here is to switch from alter ego law, which is something they didn't advocate below, to this so-called single business enterprise or SBE theory under Louisiana law. And their articulation of that in the district court's articulation is just not faithful to Louisiana appellate precedents or indeed to the guidance from this court. SBE is not a sort of free-floating analysis about whether some companies seem like they are related to one another. It is not a substantively different doctrine than alter ego. As this court put it in Ark-La-Tex Timber, it is a similar doctrine, but for affiliates rather than for a parent company or a shareholder. You are piercing the veil, to use the term loosely, horizontally instead of vertically. And that's why you'll see the Seminole case, Green, was actually considering alter ego. That's why. Sounds like there's not much dispute about what the facts were which led the district court to conclude that it was a single business enterprise. You're not really disputing the facts. You're just talking about how we interpret the applicable law. Is that right? I think there's some of both, Your Honor. I think there is a fundamental legal disagreement about what SBE means. And so, for instance, this court repeatedly has treated Green as articulating Green, the sort of foundational SBE case, as articulating— But you agree that if you take the law and apply it, you have to examine what the facts are, and the district court relied on a significant number of facts in making that determination about the single business enterprise. Isn't that right? Yes, Your Honor. Absolutely. All right. I do think that there is some dispute about some of the documents here. And if you look at some of the documents that plaintiffs have highlighted and that the district court interpreted, we do think, Judge Graves, that there is some significant dispute about those. And I would simply say we would urge you to carefully scrutinize them. And let me point you to one that is this sort of intimate day-to-day control so that two entities have no separation whatsoever. And the best example of that that plaintiffs point to is a Tyshawn Board of Directors resolution. It's in the record. It's 66990. And they say that this document demonstrates that BNBM was telling Tyshawn how to produce drywall, what kind of drywall to produce, and that that shows that kind of day-to-day control. But if you look at the document, nothing could be further from the truth. It is a garden-variety Board of Directors resolution that's... Jumping back to the agency theory of jurisdiction, is it your view that it does, that the agency theory specifically does or does not require looking to foreign law? Or does it depend on that state's choice of law provision? I want to fight the articulation a bit, if I could, Judge Willett. The question is, under foreign state law, which substantive law applies? The substantive law that applies is Chinese law. And so you look at what Chinese law does, what analysis it uses, what the test is for procuring contacts. And Chinese law doesn't, I mean, Chinese law just has Article 20, and that's the way you do it. So the reason I said I want to fight the framing a little bit, you don't look at whether you're in the agency law bucket or look at whether you're in the alter ego bucket first. You move into the Chinese law bucket and look at what Chinese law requires. You've exceeded your time. You'll have some time on rebuttal. Thank you, Your Honor. Mr. Peck. May it please the Court. My name is Robert Peck. I'm here on behalf of the plaintiffs, police in this case. I'd like to start with the question on agency that you raised, because I do think that the 2014 decision that we briefed as drywall 2 does answer that question. If you look at footnote 6, which is where the discussion is, not only is there the acknowledgment that Taishan had represented to the Court, and as a result the Court accepted that the Florida State Court. And in that Lenore case, the Court says that property damage suffered by hundreds of Florida residents comprises the foundation of this litigation, and this factor weighs heavily in finding that Florida law should apply in determining whether Taishan's actions should be attributed under Florida principles of agency. The opposing counsel says our 2014 case isn't binding, because we just sort of assumed. We didn't conclude or hold. We just assumed. I would say that your case isn't binding with respect to the representation by Taishan, but it is binding by Florida's examination of its own law and its own conclusion that its law applies, because sitting in diversity, we have to apply the law as the state would. And here, Florida has made clear, not only in the Lenore case, which is cited there, but in ENIT, in Development Corporation of Palm Beach, that indeed we apply Florida law, and Florida law is all about control. And control here is the issue, because my friend tells you it's really got to first meet mutual consent. Well, there are three elements to agency under Florida law. First, there's got to be an acknowledgment by the principal that there is an agent, and that acknowledgment can occur either before or after. It can occur by ratification. There has to be an acknowledgment by the agent that they're actually performing something on behalf of the principal. So they're calling this mutual assent. But the fact of the matter is the Florida cases indicate that mutual assent is met when you have such a degree of control that essentially the agent has no choice, and the parent is basically telling them what to do. And we have that here. And similarly, under Virginia law, you have the Virginia statutes that say, First American title insurance is the great example here cited by both sides, that in Virginia, the power to control is the determining factor on agency. And so we go with that, because, again, even in Murphy, the case that is cited by my friend to say that Virginia does use mutual assent, the Virginia Supreme Court in the same case says that if a franchise contract so regulates the activities of the franchisee as to vest the franchisor with control within the definition of agency, then the agency relationship arises even if the parties deny it. So it is clear that both states would apply their own agency law. They would not look to piercing the veil, which is not a concept within agency. You can have an agent who is completely unrelated to your corporation. And so the fact that you can have a parent agency indicates that we're not looking about the corporate structure here. So having looked at that, then the question is, what kind of control? And my friend does skip over the extensive record, two years of jurisdictional discovery that was only merely touched by the district court, probably because they didn't want to go beyond the district court. But BNBM determined how Tayshaun would grow, make capital expenditures, even manufacture its drywall. They didn't just nominate directors for Tayshaun's board. They actually appointed them and then told them how to vote. That, unlike the Bridge case, which my friend cites, which says that you can switch hats and then still be true to the new hat that you're wearing, here that was not true and it was not possible. Three, BNBM controlled long-term strategic decisions, including the capacity for new factories, the type of drywall that Tayshaun would manufacture, where the products were marketed and sold. And that also connects them to the jurisdictions where they were sold. Ford, BNBM, admitted it controlled the daily operation and important activities of Tayshaun and even held itself out as the same entity as Tayshaun in marketing materials and other materials so that it could claim that one company, using all the data from both, had a outsized impact on the drywall industry and was the largest in China. And so we can go through many more. There were many in the record that the district court did not cite. But the fact of the matter is that we're talking about daily control. Take for example the 2008 announcement of BNBM's acquisition of a controlling interest in Tayshaun. In there, it says, acquisition will enable the CNBM group to further enhance its competitiveness, consolidate the leading position in the drywall market, and participate more actively in the daily activities, operations, and management of Tayshaun. So therefore, they were already involved in the daily activities. But they did so even on a greater basis. There were a few pages in the district court's 100-page opinion when they're talking about control. The district court relied on its understanding of Chinese corporate culture. Not really concrete things like board seats, phone calls, emails. There was kind of this appraisal the district court did of Chinese corporate culture. And I'm wondering, what do you think about the, if courts are equipped, do courts have the tools to engage in this sort of assessment or appraisal of foreign corporate culture? Let me point out first that in all those instances where it talked about culture and it talked about the hierarchical nature of the Chinese corporate law, it was citing to law review our expert, who was a law professor in China who was responsible for the company law, talked about it as well in terms of culture because that's the way you understand it. He said, we're using Western concepts, but we're not really doing the Western concepts other than in form, not in function. And so he made it very clear that there is this hierarchical nature. And in fact, we have the US Department of Commerce's position, which was recited in the Federal Court of International Trade, that says that they basically regard the Chinese government as basically running everything, no matter how far down the subsidiary is. So the evidence is very overwhelming. But of course, I don't believe the district court relied solely on that. I think that was a confirming factor to the district court. The court's appraisal may have been completely accurate and on target. I'm not convinced that it's the business of courts to be speculating. It may not be, but I think he's using that as confirmation of the facts and the emails and the annual reports and everything else that was seen in this case. Remember, the second time that depositions were taken in Hong Kong, because the first one was so disastrous, there were disputes about the interpretation of the depositions, the translation. There were disputes about whether questions could be asked or answered and things like that. He traveled there, so he not only, as he put into the opinion, he not only listened to this with a single appointed translator that basically was the authoritative source of translation, but he got to watch the demeanor of those who were deposed and realized when they were basically saying that, well, they didn't remember this document, they didn't know what their concern, and so he was able to make those evaluations, much as you would do in a living courtroom where courts normally trust the decision by the fact finder, in this case the judge. And so I think that the observations about culture were not central to the decision, but were confirmatory. You said there was testimony about the culture, though? The testimony... Via deposition. There was not testimony about the culture. There was references to the culture. So when you say he was able to observe... He was able to observe... You're talking about the judge? Yes. What did he observe? I'm sorry? What is it you're talking about he observed? He observed their demeanor, and so therefore could make evaluations about their truthfulness when they denied that they remembered emails and evidence and things like that. I'm just trying to figure out, he observed their demeanor at a hearing, on a videotape? He was there. So there was a hearing? It was. He was at the depositions in Hong Kong, in person. And so he was there to be able to rule on objections and take care of things right away and make this a more efficient process than the first attempt at taking depositions. And so what we're saying is that everything the testimony... Take for example one of the customers of BNBM in Florida, Mr. Han. There are emails in the record that show that, for example, he wanted more drywall. He needed more, and he went to BNBM, and the representative of BNBM, Mr. Wei, then contacted his superiors in China and said, we need more. We're going to be able to supply this, and they supplied it through Taishan. And so therefore, again, they brought Mr. Han to China so that he could meet with people, and they supplied it through Taishan. So the interconnectedness, the fact that they would not observe these formalities was really quite overwhelming, and the record shows that, and the district court has done a good job of trying to convey that. So we can go into other things. BNBM was responsible for land use, certificates for financial and strategic decisions. Taishan could not take out a loan unless BNBM was the guarantor of the loan, even though they never had to make good on the guarantee. There were all these things that were in the control that was both intimate and daily. In Judge Fallon's opinion, he seems to rely on the defendant's concession or admission or representation that Chinese, there was no material difference between Chinese law and the foreign states' law. My friend said that he argued this in the alternative. That was not our understanding. That was not the judge's understanding. Basically, they said the outcome is the same regardless of what law you use. And given the experience with the Taishan representations, given the fact that the emphasis was on control with every type of law you were talking about, whether it was agency law, single business enterprise, Chinese law, control is a central feature and determinative feature. If you took a Venn diagram, the difference of the interlocking circles would be a very small sliver. And so therefore, I think the judge could basically say that the representations were sufficiently similar to what he experienced in the Taishan case, that the law was similar and I think that the claim now that the law is so different is really one that might fall under invited error. So here, remember, they're basically saying the only difference is that there has to be agency law, but with respect to piercing the veil, he said there has to be some sort of fraud and the court didn't find fraud. But of course, under Louisiana law, fraud is not the be all or say all of that, but equity too. And in deciding choice of law, the state also looks at who has the greater interest in the litigation. And that's not purely a simple categorical rule that you go to the place of incorporation, but you consider also under Louisiana statute, under Virginia case law, where indeed that really is taking place. And here we had hundreds upon hundreds of injured parties who had defective drywall making them sick, causing their homes to have to be remodeled yet again, things like that. So there was a substantial interest in each one of these states in making sure that this litigation went on in a proper way. And so as I said, not only did their agency law apply, but the single business enterprise law clearly applied as well. Bonafide demolition is the case that refers to the fact that there is a distinct difference between traditional veil piercing and SBE theory. That uses that 18-factor green test. Those are non-exhaustive factors, but they are factors to be considered, and the district court considered them and found the first three to be overwhelmingly present. And again, once again, control and the totality of the circumstances are some of the metrics that you use to make that decision. And so under SBE law in Louisiana, they consider whether a corporation has sufficient ownership interest in another to give it actual working control, whether common directors and officers exist, where a unified administrative control apparatus is present, and whether business functions are similar or supplementary. Now, in the briefing, you heard from the other side that they're competitors. BNBM and Taishan are competitors, but the fact of the matter is they really did cooperate. In fact, most of BNBM's profit was derived from whatever Taishan brought in. And when they talked about their profit, they talked about the combined profits of the two entities. And so then again, you're seeing that these kinds of separations, these parchment barriers that indicate that there are separate corporations, are easily breached and set aside essentially at whim whenever it serves the interests of the greater corporation. And that has been the fact of the record here. And returning for a moment to the description of culture in Chinese law, even one of the law review articles that was cited by the defendants in their briefing states that China's legal system, while heavily influenced by Western legal norms, is embedded in a complex economic, cultural, and ideological system that is unique and distinct from Western counterparts. And so what you had is the testimony of every one of the experts on Chinese law who basically said, well, you know, you have to be a little careful. We talk about certain concepts that are familiar to us about corporate separateness and corporate formalities. And that's not really the way that things operate. Again, the law professor that we used as an expert who was one of the primary progenitors of the company law makes clear that, you know, we relied heavily on our understanding of Western common law, but with a Chinese influence to it and the way that we look at it. Even in one of the depositions, the record shows that one of the representatives of the company had difficulty saying, well, you know, that might be an exaggeration. You shouldn't take everything in a Chinese document as the truth. So that's the kind of thing that might have led you to believe that these scholars, these neutral scholars who've written about Chinese law and talk about the influence of culture might be right. But it also gives you the sense that some of the representations, which conflicted with written documentation, might not be as credible as other documents. And so that's one reason why we think that Judge Fallon, you know, carefully went through this record, participated in the discovery, had a better sense of it than you're getting from the cherry-picked nuggets that my friends have provided to you, while looking at the overall record and again the totality of the circumstances. I remind you that, you know, the court said that these entities were led and controlled by the CNBM group, who ensured that each of the entities under it were working to maximize profits for CNBM. And they directed BNBM, and BNBM did their bidding to Taishan. This was a cascading kind of control over them, and the court found that to be present. So these were not mere investors in the way that we understand separate corporations and stockholders. But they took over Taishan as an entity under their direct control so that in all critical respects that we're looking at here, they were another department of a larger corporation. Thank you. Your time has exceeded. Thank you. Thank you, Your Honor. Judge Willett, I want to start again with your question about which law governs. My friend pointed to footnote 6 in Drywall and the Lenar. They have not properly preserved this argument, and we've explained why that's so at page 4 of the reply brief. They never made this argument. Below, and even if you entertain it, it is wrong. And again on page 4 of the reply brief, we point you to the relevant Florida law. Florida cases like Chatlow's adopt the approach of the restatement. That's the first point. Second, Judge Dennis, you asked me and my friend about the supposed admission below. I would urge you to take a careful look at page 53380 of the record. What we said there was that plaintiffs said that we argued there was no conflict. And what we say on this page, the defendants said no such thing. That does not mean the legal standards are the same. We absolutely did not concede that the standards are the same, and they are not. 53380. 53380. Third point, this question of control keeps coming up, and there are a couple of things to say about it. One, control is not a dirty word. There can be control. Of course there's control. That's the whole point of a parent in a subsidiary. And similarly, my friend says that there's something wrong with maximizing profits. Of course they're maximizing profits. They're corporations. They have an obligation to their shareholders to do that. The question is what is the right kind of control? And that's why it's so critical to look at what these different states use as the actual legal tests. And it's not just control in the abstract. They are very specific standards. My friend says that Louisiana law doesn't require fraud or deceit. The language in Riggins is that it was reversing because there was no showing of, quote, fraud or deceit by the shareholder acting through the corporation. That's Riggins at 1168, and they admit it, page 15 of the red brief, that that's the standard. I agree with my friend that the bona fide demolition case is a very good one. In it, Judge Vance explains SBE and points out that the 18-factor test is difficult to apply, provides no guidance, and to this point about control, some of the factors are perfectly consistent with legitimate efficient business operations. That's why it's essential to think about the right kind of control. The last category of thing I want to address is the facts here, and I obviously can't respond to everything that was just invoked, but there are a few things to point out. First, there was a suggestion that deference is required here, and that's wrong twice over. When a district court makes legal errors, this court held in City of Alexandria v. Brown, and a long line of cases going back that you review the facts de novo. Second, there are no credibility findings here. There is a somewhat extraordinary suggestion that I hear being made that the district court could have concluded, I don't know, that Chinese people are not trustworthy or something. That was the suggestion. Certainly there was no credibility finding about Chinese people in general or about any of the witnesses who were at those depositions. And finally, with regard to the facts, I would again just urge the court to carefully scrutinize the documents. My friend says that Taishan directors were told how to vote. The document you want to look at is 65782 to 65783. That's what they've relied on for that, and that document is about CNBM Group, and what it says that it must approve major decisions by companies for which it nominates directors, but CNBM Group doesn't appoint Taishan or even BNBM directors. That's clear at 49358 and 66975 of the record. They've said again that BNBM told Taishan what drywall to make and how. That was the point I addressed in my opening. That's the Taishan Board of Directors resolution at 66990. It simply doesn't say that. They've invoked this connected transaction announcement at 60939. That's a document about CNBM Group. It says nothing about BNBM, and that leads to the last point I want to make here. It is absolutely critical that the court carefully scrutinize each of the companies separately. Cases like Alpine View are absolutely clear that you have to look at each company in a corporate hierarchy separately, and there is no argument in the briefs and still again none here today that BNBM Group or CNBM, these intermediate entities, had any control whatsoever about Taishan, and so whatever else you conclude in this appeal, those two entities have to be dismissed from this litigation. Bring your argument to a close. If I may, a final sentence, Your Honor. What plaintiffs are asking for with this free-floating assertion about control as the standard would be absolutely revolutionary in corporate law, and indeed, Judge Willett, for some of the reasons you were alluding to, in international law. There is simply no basis to conclude that a bit of control is a basis for availability. Thank you, Your Honor.